IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT SIMON, | : | |
|     Plaintiff | : | |
| | : | No. 1:21-cv-00970 |
|     v. | : | |
| | : | (Judge Rambo) |
| PAM SMITH, et al., | : | |
|     Defendants | : | |

## MEMORANDUM

Presently before the court is Defendants' motion for summary judgment (Doc. 42). For the reasons that follow, the motion will be granted and the case dismissed.

**I.    Procedural History**

Plaintiff Robert Simon filed a *pro se* civil rights complaint pursuant to 42 U.S.C. § 1983 on May 28, 2021. (Doc. 1). After screening the case pursuant to 28 U.S.C. § 1915, the Court granted Simon leave to file an amended complaint, which the Court again screened. (Docs. 14, 15). As the Court interprets the operative complaint, Simon asserts the following claims:

- First Amendment retaliation claims against Defendants Leah Martin, Pam Smith, CO Houston, CO Sopata, C. Jones, CO Natale, CO Snyder, CO Kutney, CO Kalapat, Officer Arvonio, Sgt. Bower, Kevin Ransom, Lt. Trevethan, Mr. Goyne, Deputy Cronauer, Sgt. Conrad, Sgt. Miskalis,

Lt. Belles, Lt. Gavlick, Jason Bohinski, Jaqueline Chakan, and Sgt. Everette;

- Eighth Amendment denial of medical and mental health care claims against Defendants Scott Prince, Kimberly Harris, Dr. Ashton, Martin, and Smith; and

- Fourteenth Amendment due process claims against Defendants Martin and Smith.[1]

Defendants moved for summary judgment on June 14, 2023. Despite multiple extensions of time (Docs. 56, 58), Simon did not respond to the motion, and the time to do so has long passed. Accordingly, the Court accepts the facts in Defendants' Statement of Undisputed Material Facts (Doc. 53) as undisputed for purposes of the motion. *See* M.D. Pa. L. R. 56-1.

---

[1] The amended complaint is admittedly unclear as to which claims were directed against which defendants. Defendants argue that Simon was only permitted to proceed on First Amendment retaliation claims against Martin and Smith; Eighth Amendment denial of medical and mental health care claims against Defendants Prince, Austin, and Ashton; and Fourteenth Amendment due process claims against Defendants Martin, Smith, and Burla. Those were the claims that survived the initial, superseded complaint. *See* (Doc. 11 at 2). However, in screening the operative complaint, the Court determined that the "majority of his claims [in the amended complaint] may proceed," subject to further restrictions outlined in that order. (Doc. 15 at 3). To the extent any of the claims were intended against additional defendants, those claims would be dismissed for the reasons discussed below.

2

## II.     Legal Standards

### A.     Summary Judgment

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if it could lead a reasonable jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

At the summary judgment stage, the court must view the facts and all reasonable inferences in favor of Simon, the nonmoving party. *See Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988). The nonmoving party may not rest on the allegations of his or her pleadings, but must produce evidence, through affidavits, depositions, answers to interrogatories or the like, to demonstrate specific material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The nonmoving party must also comply with Local Rule 56.1, by submitting a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried." If the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." M.D. Pa. L.R. 56.1. These rules apply to Simon even though he is proceeding *pro se*. *See Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) (noting that pro se parties "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants").

**B.    Section 1983**

Section 1983 is the vehicle by which private citizens may seek redress for violations of federal constitutional rights committed by state officials. 42 U.S.C. § 1983. The statute states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

*Id.* "Section 1983 is not a source of substantive rights," but is merely a means through which "to vindicate violations of federal law committed by state actors." *Pappas v. City of Lebanon*, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting

*Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002)). To state a cause of action under Section 1983, a plaintiff must allege that: (1) the conduct complained of was committed by persons acting under color of state law; and (2) the conduct violated a right, privilege, or immunity secured by the Constitution or laws of the United States. *Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 189 (3d Cir. 2005) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). "A defendant in a civil rights action must have personal involvement in the alleged wrongs." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). "Personal involvement requires particular 'allegations of personal direction or of actual knowledge and acquiescence.'" *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (quoting *Rode*, 845 F.2d at 1207).

### III.     Material Facts

Because Simon did not respond to the motion, the facts in Defendants' statement of material facts are deemed admitted. M.D. Pa. L.R. 56.1. The following summary of facts also draws from Simon's statements at his own deposition (Doc. 53-1), where those statements do not conflict with the undisputed material facts. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

Simon has been incarcerated at State Correctional Institution – Dallas ("SCI-Dallas") since 2017. (Deposition of Robert Simon, Doc. 53-1, 6:1-10). The

prison's grievance procedures are set forth in a policy manual. Grievances must be submitted in writing within 15 days of the incident. Once received, grievances are processed in ascending levels of review: (1) an initial review by a Grievance Officer; (2) appeal to the Facility Manager or designee; and (3) appeal to the Secretary's Office of Inmate Grievance and Appeals ("SOIGA") for final review. If an inmate's grievance is denied, the grievance procedure is not complete until the inmate has appealed to all three levels. (Declaration of Keri Moore, Doc. 53-4 ¶¶ 2-11).

During the COVID-19 pandemic, Simon and other inmates were unhappy with the prison's COVID-19 protocols, certain officers' failure to follow the protocols, and unsanitary conditions at the prison, among other issues.[2] Simon filed multiple grievances about the situation and complained verbally to several officers. (Simon Dep. 21:15-27:25). On October 16, 2020, numerous inmates engaged in "a riot," during which inmates "trashed" J Block, where Simon was housed, by throwing trash and lighting fires. After the riot, Superintendent Kevin Ransom and Lieutenant Trevethan "went door to door trying to figure out what

---

[2] *See* (Doc. 1, ¶¶ 32-44). Much of the lengthy amended complaint restates allegations related to COVID-19 protocols at SCI-Dallas, but the Court has dismissed those claims with prejudice. (Doc. 11 at 2). For clarity, the Court's summary is focused on the claims for which Simon was permitted to proceed.

was going on," and Simon complained to Ransom and Trevethan about the conditions on J Block. (*Id*., 60:5-62:4, 63:12-64:12).

Three days later, on October 19, 2020, Simon was placed in the Restrictive Housing Unit ("RHU"), as a disciplinary measure. He received a misconduct charge[3] alleging that another officer witnessed him light cardboard on fire and throw it, causing the fire alarms to go off. Simon denied lighting anything on fire, or participating in the riot, but the prison found him culpable after a disciplinary hearing, and he was moved to the RHU for six months, plus an additional month for refusing to accept a cell mate. (*Id*., 20:18-25, 62:15-24). Simon asserts that the charge against him was "fabricated," and that he was disciplined and placed in the RHU in retaliation for his prior complaints about J Block. (*Id*., 37:18-39:9, 62:8-66:1).

In the RHU, Simon continued to make written and oral complaints about his conditions of confinement. Because some of the food served to Simon in the RHU was frozen, spoiled, or left out unattended for long periods, and because he was not receiving the "lactose intolerant" diet that he was assigned, Simon refused certain food for a period of time. (*Id*., 55:12-57:13). The SCI-Dallas medical staff classified Simon's refusals of food as a "hunger strike," and Simon received daily

---

[3] The citation was issued by "Officer Hicks" (Simon Dep. 64:16-19), who is not a defendant.

7

visits from the medical staff.  (Doc. 53-3 at 6-8).  He was charged $5.00 per day in medical co-pays[4], which depleted his account.  Simon objected to the $5.00 per day, because "if I was on a hunger strike for two months straight, then obviously I'd be dead."  He filed grievances about the depletion of his funds, which he directed to Leah Martin, a healthcare administrator.[5]  (Simon Dep. 53:15-55:11).

Simon also sought mental health treatment, by filling out "request slips" to speak to mental health staff, but many of those requests were ignored. (*Id.*, 66:2-67:13, 80:9-83:8).  Simon did have weekly meetings with Kimberly Harris, a psychiatric professional, but Harris focused on why he was refusing food rather than other aspects of his mental health.  (*Id.*, 67:22-68:13).  Harris also told Simon there were limits to the mental health treatment the prison would offer because of changes in how the RHU was run during the pandemic. (*Id.*, 79:3-82:3).

During this litigation, an SCI-Dallas employee reviewed the files on its grievance tracking system pertaining to Simon. (Declaration of Nichole Moore,

---

[4] For clarity, the Court takes judicial notice of DOC Administrative Policy DC-ADM 820, which requires inmates to pay a $5.00 co-pay for medical services to address "self-inflicted" injury or illness.  *See Vanderklok v. United States*, 868 F.3d 189, 205 (3d Cir. 2017) (court may take judicial notice of information "publicly available on government websites"); *Harper v. Tritt*, No. 3:16-CV-1640, 2017 WL 4700730, at *6 (M.D. Pa. Oct. 19, 2017), aff'd, 726 F. App'x 101 (3d Cir. 2018) (taking judicial notice of DC-ADM 820).

[5] The Court infers that all relief requested in these grievances was denied, although no party says so explicitly.

Doc. 53-5). Defendants produced Simon's "grievance history," which lists 31 grievances that he filed pertaining to SCI-Dallas between December 2019 and January 2022. (*Id*. at 4-5). Simon's grievance history indicates that he filed 26 grievances during the roughly seven-month period[6] he was housed in the RHU. Of these, only two – relating to "Medical Co-Pay[s]," – were appealed to the final stage (SOIGA). The records indicate that although Simon filed grievances related to "Health Care," "Conditions," and "Problems with Staff-Medical," among other topics, none of these were appealed past the second stage. (*Id*.).

## IV. Administrative Remedies

Pursuant to the Prison Litigation Reform Act ("PLRA"), a prisoner must pursue all available avenues of relief through the applicable grievance system before initiating a federal civil rights action. *See* 42 U.S.C. § 1997e(a); *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001) ("[A]n inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues."). An inmate's failure to exhaust will be excused only "under certain limited circumstances," *Harris v. Armstrong*, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate may defeat a claim of failure to exhaust only by showing that "he was

---

[6] Simon testified that he entered the RHU on October 19, 2020, and stayed for seven months; records produced by the facility appear to indicate that he entered on October 21, 2020, and left on May 6, 2021. *See* (Doc. 53-2).

misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate." *Davis v. Warman*, 49 F. App'x 365, 368 (3d Cir. 2002).

A prisoner is only required to exhaust administrative remedies that are "available." *Rinaldi v. United States*, 904 F.3d 257, 268 (2018). An administrative remedy is unavailable "(1) when 'it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates'; (2) when it is 'so opaque that it becomes, practically speaking, incapable of use,' such as when no ordinary prisoner can discern or navigate it; or (3) when 'prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" *Id*. at 266-67 (quoting *Ross v. Blake*, 578 U.S. 632, 643-44 (2016)). The burden is on the plaintiff to show that administrative remedies were unavailable. *Rinaldi*, 904 F.3d at 268.

In this case, the undisputed facts indicate that Simon did not exhaust the administrative remedies for most of his claims. The only grievances that Simon appeared to exhaust were related to medical co-pays. Simon filed numerous grievances during his roughly seven months was in the RHU, including the two he apparently pursued to exhaustion, and no evidence supports a reasonable inference that the grievance process was unavailable to him. On that basis, the Court grants summary judgment to Defendants on all claims except those arising from Simon's
10

medical co-pays. Given the evidence that two grievances relating to co-pays were appealed to exhaustion around the time relevant to this action, there remains a question of material fact as to whether Simon exhausted his remedies as to those claims. The Court therefore considers whether the evidence relating to the co-pays could support a claim under the First Amendment, for retaliation, or the Fourteenth Amendment, for denial of due process.[7]

## V. Discussion

### A. Medical Co-Pays

The summary judgment record pertaining to Simon's medical co-pays is limited. Although two grievances on the topic were apparently exhausted, the grievances and responses are not included in the summary judgment record. Viewing the available evidence in the light most favorable to Simon, the Court

---

[7] The evidence relating to co-pays would not support a claim for denial of medical care under the Eighth Amendment. There is no evidence that Simon was denied medical care, or even that he received different medical care, because of his inability to pay a co-pay. *See Lanza v. Moclock*, No. 3:17-CV-1318, 2018 WL 3060030, at *9 (M.D. Pa. June 20, 2018), aff'd, 842 F. App'x 714 (3d Cir. 2021); *Reynolds v. Wagner*, 936 F. Supp. 1216, 1224-1226 (E.D. Pa. 1996), aff'd, 128 F.3d 166 (3d Cir. 1997). "It is well-established that allegations of a defendant's consideration of costs associated with treating a prisoner-plaintiff's non-emergency medical condition does not state a claim of deliberate indifference, as prisoners 'do not have a constitutional right to limitless medical care, free of the cost constraints under which law-abiding citizens receive treatment.'" *Lanza*, 2018 WL 3060030, at *9 (quoting *Winslow v. Prison Health Servs.*, 406 Fed.Appx. 671, 674 (3d Cir. 2011)).

understands his claim as follows: The SCI-Dallas medical staff interpreted Simon's refusal to eat certain foods as a hunger strike requiring medical services, for which Simon was charged daily $5.00 co-pays.  Simon received daily medical monitoring relating to his food consumption[8], but believes the co-pays were inappropriate, because he was not on a hunger strike since he was still eating some food during this period.  Simon believes the medical staff falsely characterized this issue as a hunger strike so they could deplete his prisoner account while maintaining compliance with DOC policy.  The Court considers whether Simon can sustain a claim of retaliation, or denial of due process, from these facts and inferences.

### B. Retaliation

Simon asserts that the co-pays were assessed was enforced in retaliation for his complaints about prison conditions, in violation of the First Amendment.

An inmate retains First Amendment protections when they are "not inconsistent" with prisoner status or with the "legitimate penological objectives of the corrections system." *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017) (quoting *Newman v. Beard*, 617 F.3d 775, 781 (3d Cir. 2010)).  To state a prima facie case of First Amendment retaliation, a plaintiff must show that (1) he was engaged in constitutionally protected conduct, (2) he suffered an "adverse action"

---

[8] In the context of a grievance about his medical care, Simon acknowledged he had been "denying my meal trays for 6 days" and was receiving "daily assessments" from medical staff related to his refusal of food.  *See* (Doc. 53-3 at 7-9).

12

by prison officials sufficient to deter a person of ordinary firmness from exercising his First Amendment rights, and (3) the plaintiff's protected conduct was a "substantial or motivating factor" in the prison officials' decision to take the adverse action. *Id*. (citations and quotations omitted). Typically, the plaintiff must show "unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action," or "a pattern of antagonism coupled with timing to establish a causal link." *Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016). In some cases, causation can be established "from the evidence gleaned from the record as a whole." *Id*. Even if a prisoner demonstrates causation, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest. *Rauser v. Horn*, 241 F.3d 330, 334 (3d Cir. 2001).

The record here does not support a reasonable inference of retaliation. Although Simon written grievances (and likely, his oral complaints[9]) were protected conduct, he has not shown that the grievances were a substantial or motivating factor in the decision to assess him medical co-pays.

---

[9] Defendants argue that oral complaints are not protected activity, but the DOC's own grievance policy encourages inmates to "make every effort to resolve a concern informally," including by "direct conversation" with the officer in charge. (Doc. 53-4 at 10); *see Mack v. Warden Loretto FCI*, 839 F.3d 286, 297-99 (3d Cir. 2016) ("It would be illogical to allow prison officials to retaliate against Mack for his oral complaint if [the prison] encourages the type of informal resolution that Mack attempted.").

Broadly speaking, Simon asserts that prison officials punished him in various ways over several months, because of the complaints he was raising about prison conditions: first by placing him in the RHU on what he calls a "fabricated" disciplinary violation, and then subjecting him to substandard conditions in the RHU. Simon refers to witnesses who told him he was "collateral damage" for the riot on J Block, and was "made an example of" so that order could be restored. (Simon Dep. 37:22-38:2, 75:10-15). But to the extent the prison sent him to the RHU to restore order after the riot, that was in service of a "legitimate penological interest," for which prison officials enjoy significant deference. *Rauser*, 241 F.3d at 334.

Simon argues that he was innocent of the disciplinary charge and his misconduct report was "fabricated," but the evidence is clear that an officer reported seeing him light cardboard on fire on J Block, and that fires were lit on J Block during the "riot" on the day in question. It is not the Court's role to relitigate the disciplinary proceedings. Ultimately, Simon was found guilty after a hearing, which "is considered strong evidence that the misconduct report was issued for a legitimate penological reason." *Drumgo v. Reese*, No. 3:20-CV-02434, 2022 WL 4295442, at *15 (M.D. Pa. May 20, 2022) (citations omitted). It also indicates that Simon would have been disciplined regardless of the broader complaints he was making. *Id*.; *see also Zehring v. Sorber*, No. CV 20-3195, 2020

WL 7041759, at *12 (E.D. Pa. Dec. 1, 2020) ("'rumors' from fellow inmates who overheard [prison] staff calling [the plaintiff] a 'chronic complainer' and [stating] that the administration has grown weary of his complaints" did not sustain a retaliation claim).

Many of the conditions Simon objects to – such as the limits on the medical care he received there – apparently resulted from changes the facility implemented in response to COVID-19. *See, e.g.*, (Simon Dep. 81:21-82:3 ("[Harris] was basically saying that everybody in the RHU is under strict orders because of COVID to act in the way that they were acting . . . the RHU was [run] at that time[] different from how it was usually [run].")). While these issues created a difficult and unpleasant situation for Simon, the facts do not suggest that he was retaliated against for complaining.

Turning to the medical co-pays specifically, the record still does not show retaliation. Simon identifies only one defendant he associates with the decision to charge him medical co-pays: Leah Martin, whom Simon describes as a "healthcare administrator." It is unclear whether Martin was directly involved in Simon's care, or a supervisor to whom he directed his grievances. Regardless, Simon presents no evidence that Martin was aware of his prior complaints about SCI-Dallas. Even if she was, there is no evidence she was implicated in those complaints, which cuts against any inference that they would cause her to retaliate. *See Nunez v. Wetzel*,

15

No. 1:21-CV-01484, 2023 WL 2385931, at *5 (M.D. Pa. Mar. 6, 2023) (listing dismissals of retaliation claims where the alleged retaliator was not the target of the protected activity).

Simon's retaliation claim fails for another reason: When a medical co-pay is deducted for the benefit of an inmate's healthcare, the deduction is not an adverse action. *Whitehead v. Wetzel*, 720 F. App'x 657, 661 (3d Cir. 2017). Simon concedes that he received daily medical visits, but objects to the medical staff's assessment of the situation as a "hunger strike," and argues that he should not have been charged $5.00 co-pays because he was still eating some food. But a person can be eating some food and yet require ongoing medical attention, and DOC policy appears to require co-pays for any "self-inflicted" injury, not just hunger strikes. Simon evidently disagreed with the medical judgment by Martin, and/or other staff at SCI-Dallas, about what medical care he needed. But no evidence indicates that Martin had any retaliatory purpose for how she applied DOC policy. *See Graham v. Connors*, No. 1:19-CV-01571, 2020 WL 4284122, at *10 (M.D. Pa. July 27, 2020); *Tritt*, 2017 WL 4700730, at *8 (allegation that medical staff mischaracterized an illness did not sustain a claim that assessment of co-pays was retaliatory).

16

## C. Due Process

Finally, Simon pursues a claim under the Fourteenth Amendment for violation of his due process rights based on the assessment of co-pays. "Inmates have a property interest in funds held in prison accounts, [and are] entitled to due process with respect to any deprivation of this money." *Dockery v. Beard*, 509 F. App'x 107, 114 (3d Cir. 2013) (quoting *Reynolds v. Wagner*, 128 F.3d 166, 179 (3d Cir. 1997)). In the context of inmates' medical co-pays, due process standards are "flexible," in part because "the inmates receive the benefit of health care, the value of which undoubtedly exceeds the modest fee assessed." *Reynolds*, 128 F.3d at 180. There is no requirement that the inmate authorize a co-pay in advance; rather, the focus is whether inmates are provided notice and procedures "to be able to challenge any improper deprivation." *Id*.

Simon presents no evidence or argument that he lacked notice of the co-pay policy or was otherwise denied due process. The undisputed facts indicate that he pursued and exhausted two grievances on the issue. Simon disagrees with the decision to charge him co-pays, but that does not sustain a due process claim. *Lanza*, 2018 WL 3060030, at *10 ("Lanza was provided with all the due process to which he was entitled with respect to the assessment of medical co-pays and the fact that he may disagree with the resolution of his grievances does not state a claim for a violation of due process."); *Quinnones v. Fischi*, No. 3:08-CV-2267,

17

2012 WL 1072278, at *4 (M.D. Pa. Mar. 29, 2012) ("Prison grievance procedures constitute an adequate remedy for a prisoner to challenge deductions from his account.") (listing cases); *see also Rambert v. Beard*, No. 4:09-CV-0634, 2012 WL 760619, at *15 (M.D. Pa. Mar. 7, 2012) ("Plaintiff had an adequate post-deprivation remedy [for co-pay claims] in the form of the Department's inmate grievance system.").

## VI.   Conclusion

For the foregoing reasons, the Court grants summary judgment to Defendants on all claims.  An appropriate order follows.


                                            /s/ Sylvia H. Rambo
                                            SYLVIA H. RAMBO
                                            United States District Judge

Dated: August 12, 2024